May it please the Court. First and foremost, this case presents the Court with the issue of the constitutionality of firing Plaintiff Thelma Barone for her refusal to forfeit her right to criticize the government. I'd like to make a few points about that viewpoint-based prior restraint that's at the heart of this case. The first point is that on August 10th, 2015, Ms. Barone sent an email to Chief Tim Doney telling him or informing him that she would not be signing the last chance agreement. She stated some of her concerns, among which and most importantly, was her concern about the impact that paragraph 5G, she was concerned, would have on her right to speak freely. In response, on August 12th, he changed that paragraph slightly, but the change that he made, he allowed a very limited exception that would allow, have allowed her to bring forward complaints as long as she reasonably believed, at least in the department's estimation, reasonably believed they evidenced racial profiling or discrimination. Well, that minor change obviously is insufficient under the First Amendment because it would leave in place the vast array of other potential First Amendment activities in which she would otherwise have engaged, and it's impossible to, of course, anticipate every single First Amendment activity she would want to engage in the future. It was also insufficient in her estimation as evidenced by the fact that she didn't sign the agreement on August 12th and got fired for her refusal to do that. The second point I'd like to make is I'd like to address something that is in the district court's opinion. One of the bases of the district court's opinion was that this, this limitation on Ms. Brony's free speech rights was in the context of an employment agreement, and the responsibilities as a public employee. We don't think that that limitation, even if it were in paragraph 5G, would save paragraph 5G, which would still be unconstitutional. Let me ask you some questions here because your time is limited here. I wanted to focus on your argument on why Ms. Brony was speaking, whether she was speaking as a private citizen or a public employee, and your argument as to why Ms. Brony was speaking as a private citizen seems to be focused more on, on her formal job duties. But at least in my review of the Garcetti case, it seems to instruct us that we must take what they call a practical approach and that we should look beyond the formal job duties. Here, the practical approach and seems to show that Ms. Brony went to the event knowing that she was part of the department and was facilitating a discussion with the community, which is something she described as part of her duties in the job description that she herself drafted. So I'm just curious or if you can address how, how do you assert in light of Garcetti that Ms. Brony was not Ms. Brony's job duties, which are described very well in the job description that's in the record, concerned a function as a liaison between the City of Springfield Police Department and the Hispanic community. She did not have duties as a spokesperson for the department. Her, her duties as a liaison were really between the police department and the Hispanic community, not the police department and the general public. Counsel, with respect, I'm not sure you're responding to my colleague's question. She referred to Garcetti and the fact that the Supreme Court has told us that you don't just receive. She was paid by the department to attend. She wore her work attire at that event and she regularly attended similar events discussing racial profiling. How could she not have been a public employee in that setting? She was certainly a public employee, but the issue is that she wasn't fulfilling her official job duties. I don't think you're going to get anywhere with that one, Counsel. You can try, but I don't think you're going to get anywhere with that one. Let's talk a little bit more about the prior restraint of Garcetti. Why don't we assume for purposes of our discussion here that she was acting as a public employee, and let's talk more about the prior restraint, the scope of 5G, or perhaps you can tell us why the individual named defendants are not entitled to qualified immunity, as Judge Aiken found. Your Honor, the qualified immunity issue is something that we actually have not discussed or appealed on. I'm not sure I understand the question. Okay, so perhaps I misunderstood. So you're saying that's not before us at all? That's a done deal? You're just going after the city? And Chief Doney in his official capacity. Okay, so in that case, then, what's your best argument that Chief Doney was the final policy-making authority under Oregon law? Well, both appellants and appellees cite Gillette v. Delmore, which is the case that does set forth the relevant standard. But there are some very important differences between that case and our case here. The important difference is that the basis of the Ninth Circuit's decision in Gillette v. Delmore was the fact that the Eugene City Charter specifically gave the city council and the city manager the role of having final policy-making authority in the city charter. And for that reason, the Ninth Circuit would not presume to place the final policy-making authority somewhere other than where the legislature had. And in this case, where is it? In this case, well, the Springfield City Charter, which is actually in the record, I believe, I think it's Supplemental Executive Record 115, is absolutely silent about who has final policy-making authority. But then it resides either with the city manager or the city council, right? I'm sorry, I didn't... Final decision-making, if it's silent, if there's no express delegation to the chief, then doesn't it reside either with the city manager or, failing that, the city council? No, Your Honor, because into that void, we have the statements in depositions of three key players. Chief Tindone himself, who described himself as having final authority over hiring and firing decisions. Greta Utecht, who was the human resources director, she agreed that Tindone had final policy-making authority over personnel decisions. And the city manager himself, Gino Grimaldi, who said that he has absolutely nothing to do with hiring and firing decisions, that is simply Chief Tindone's purview. Do you have the language of the city charter in Gillette? No, I don't, Your Honor. I'm just trying to figure out how the language is different with respect to the specific terms. All I have, Your Honor, is the court's characterization of that language as having firmly placed final policy-making authority in the hands of the city manager and the city council. Doesn't Oregon law itself, though, indicate that, at least in this type of city, that the final authority is with the city council, absent something expressed by the city council? I'm not aware of that, Your Honor. Okay, so from your perspective, Oregon law has just left this in a void. Well, the Oregon law gives the city the authority to legislate. Right, but it's that the governing body of the city is the city council, right? That's true, Your Honor. But couldn't there be a delegation of authority to the chief of police? Couldn't there be a delegation of authority to the chief of police, such that the chief of police is the ultimate decider in a case of employment? Yes, Your Honor, that's correct. And the testimony of Gina Grimaldi, the city manager, would be consistent with that. Did she say that the city council had delegated this authority to the chief? No, he just said that. Did anybody say that? No, Your Honor, no one actually said that. So what you have is a practice, but not an official delegation in your mind. Exactly, Your Honor. Is that sufficient under Oregon law to make the chief the final authority on this issue? Well, Your Honor, there is silence. Certainly, the city of Springfield could have legislated the identity of the person or body that had final policymaking authority, but chose not to. The only mention, actually, in the Springfield city charter of any role that the city manager would have in employment policy is that he has the authorities actually instructed to prescribe rules. But he didn't prescribe any rules that made the chief the final authority in this type of an instance. I'm not aware of that. We're really left with what some people say was a situation, but nothing official, right? There's nothing official other than the testimony of the three key players. Could we have a change to talk about the substance of the restriction? Wouldn't you say that this restriction prevented private speech as well as public speech? Yes, Your Honor. Certainly, reading the restriction on its face, it would have restricted all sorts of private speech on a matter of public concern, which is the problem with it, which is why it is so obnoxious to the First Amendment. Is the agreement in this case restricting more broad or narrow speech than in our case of Moonen v. Tice, in your view? I don't know, Your Honor. I'd have to review that decision. Let's assume for a moment, just argumental, that we agree that there is a prior restraint here and we were to so rule. Based on your pleading and so on, what exactly would you be asking the district court to do or your client? I would be asking the district court, well, the Ninth Circuit, to remand the case to the district court for a trial on . . . with respect to the prior restraint, a trial on damages because liability will have already been established, and with respect to the first claim for relief, that is a retaliation claim, a trial on both liability and damages. If you're looking for damages, are you looking for anything else? Are you looking for reinstatement? Either reinstatement or a front pay, Your Honor. Okay. And then, of course, a reimbursement of attorney fees. Do you want to save any of your time, counsel? We've only got a minute left. If you want to save any, it's up to you. Your Honor, no, I think I've . . . Yeah, so there is one thing about the prior restraint and about the one argument that the appellees make about it being justified. The appellees make the argument, essentially, that because they were concerned about things she might say, that therefore a perspective restraint on her speech was justified. And I'd just like to point out that it's not a justification. Certainly, when governments seek to silence people, they're doing so because usually they're afraid of what that individual might say. They might not like what the person says. Otherwise, they wouldn't seek to silence the person. A justification would be something like a national security concern or something like that. Okay. The justification is . . . Your time has expired. Let me ask my colleagues if anyone has any more questions. No, thank you. Counsel, thank you for your argument. Let's hear from the city. May it please the Court? My name is Mark Sherman on behalf of defendants. And first of all, I'd like to put this case into perspective. When counsel speaks about the so-called prior restraint that was part of the . . . that he says was part of the last chance agreement, you have to look at the context of this case. The last chance agreement arose because of an ongoing internal affairs investigation that led to discipline being imposed against the plaintiff. Now, her choice was either termination or, because of her long years of service, she could accept discipline, which included the last chance agreement. The last chance agreement was based on the police department's general order 26.1.1. Now, as far as we know in the record, that order, which is the police department's code of conduct for all its members, and covers 28 separate sections of a range of behaviors that are prescribed by members when they're on duty, also includes a non-disparagement clause. Now, that code of conduct, as far as we know, had been in place all 12 years that plaintiff was a member of the Springfield Police Department. She never complained about that code of conduct and that specific provision. Her union, which she was a member of for 12 years, a robust police union called the Springfield Police Association, never complained about that code of conduct. Is that relevant? Yes, it's relevant because the last chance agreement is consistent with the code of conduct and it states that she can bring complaints in her capacity as a public employee. It makes no mention of her capacity as a private citizen, and more importantly she raised one concern about the last chance agreement when she was given it and she was advised to speak with an attorney. She had her union representative with her throughout the disciplinary proceedings. The only concern she raised was that she would be unable, she thought she would be unable to bring complaints of things like discrimination and profiling in her capacity as an employee. Would you agree, counsel, if you look at paragraph 5G, even as extirpated by the chief in an attempt to try to get things resolved, it's extraordinarily broad. It would bar any disparagement or disagreement about city services generally, elected officials, services employees having nothing to do with discrimination or the things that she was normally supposed to be doing. Doesn't that fall almost squarely in the Pickering analysis? I mean, that had to deal with a school employee writing about a tax issue. You can't bar that. That's something totally outside the context of what you're dealing with here. As I read 5G, I thought, wow, that is really broad. That's really broad. Now, I get the point about the internal guidance that she clearly was acting before as a public employee, but this goes way too far, doesn't it? I don't believe it does because the union knew about it for who knows how many years. What does that have to do with it? If nobody complains before, what does that have to do with anything? Well, let's say it was broad and you bring in the Pickering analysis. Then many cases tell us that if there's a suspicion, if there's a reasonable suspicion or reasonable concern that an employee might disrupt police operations, then a restriction on that employee's speech beyond the narrow confines of what might be in a ---- but it goes well beyond the police. I mean, you read that 5G, arguably if she had a complaint about the city council and trash pickup, she couldn't have said anything about it because it was so broad. But she never raised any concern that that was a reason why she didn't sign the agreement. But she's raising it now in relation to what happened to her. I don't understand. There's maybe some problem with some law for many years, but until it's raised, I mean, now we have to address it and we deal with it. I don't know just because she never raised it before, it seems like you're trying to make a waiver argument that I'm not sure I understand. Let me ask you with respect to this prior restraint claim. In Moonen v. Tice, it seems we found a prior restraint on speech. Are you familiar with Moonen v. Tice, where there was an even narrower restriction than the speech restricted here? In Moonen, the speech restricted dealt with the canine program and the interdiction program, arguably somewhat narrow subjects and subjects that might often overlap with work-related speech. Here, the restriction on Ms. Barone bars anything disparaging about the city or the department. Well, let me just ask you, do you concede that the restriction here is broader than that in Moonen? The statute here is silent as to any effect on speech as a private citizen on matters of public concern. So if you look at a case that you cited in Moonen, the Milwaukee Police Association case from the Seventh Circuit, that makes a point of saying that where the order at issue in that case didn't make any comment about, didn't make any provision about effect on the employee's work as a private citizen, or speech as a private citizen, then you couldn't read into the provision that it affected speech as a private citizen. I don't think it said it didn't affect private speech. Well, Your Honor, I don't have it right with me. But I believe it said that the order didn't say that, but it didn't mention private speech. So, therefore, the court wasn't going to read into it that it did affect private speech. I think it was an e-mail. It didn't say one way or the other, is my recollection. I'm sorry. I'm not saying in Moonen. I'm saying in the Milwaukee case. Okay. Well, let me ask you my original question. Is the language, the restriction in this case, broader or narrower than Moonen? Not having Moonen committed to memory, I'd say it's similarly broad. But, again, it's in the context of a disciplinary implementation, and it's not an e-mail that came out of I don't remember what exactly in Moonen, and that affected a lot of employees, whereas here it was tailored to one employee. Also, if I could mention, there were reasons for them to be concerned about what she might say about disrupting police operations. She had made accusations that the sergeant who conducted her internal affairs investigation had lied about what he found in the investigation, had falsified records in the investigation. She had said that the public was outraged and they were going to march because of her. With respect, I don't think anybody on the panel is going to disagree about restraint within the department and internal issues, but this is so broad. She could speak volumes about the operations of the city and other departments without ever touching the police department. That's a problem, isn't it? Again, I can't understand if it was a problem why her union person didn't say something about it. You're referring to the waiver argument, which doesn't make sense. So it isn't relevant that she had opportunities to make suggested changes to the agreement and didn't make such a suggestion? Let's just argue, Wendell. Let's just say that the agreement had said something clearly unconstitutional like, you know, you can't associate with any Jews or Mormons. And in her police department, the union didn't say anything about it and she signed it. Would it still be legal? Matter of fact, they hadn't brought it up, didn't complain about it? It wouldn't be legal because, again, that's not something that was covered in the Code of Conduct that it relies on. The Code of Conduct talks about fairness to all people and in all situations, so it's got to be looked at in context of what it's relying on. I understand that context, but here it blocks her from discussing things well outside the context of the police department. I'm not sure what the Code of Conduct has to do with that. She could, in that capacity, talk about anything else, and this seems to block her from doing that. Isn't that correct? I don't believe it's correct in this situation. What's your best case authority for this proposition that you're asserting? I suppose that Milwaukee Police Association case in the sense that because the last chance agreement didn't say anything about private speech, speech as a private citizen, you can't read into the fact that it was to make an inference that it was restricting such speech. And if she had asked the chief, as he states in his declaration, she would have been told that it made no restriction on her private speech. And that's not a Ninth Circuit case, though, is it? No. And so we're guided by a Ninth Circuit case. It seems like that's the Moonan case, and it seems like the Moonan case is on point here. And so I'd like your best argument as to why Moonan should be distinguished or why this case is distinguishable from Moonan. I guess, as I've already kind of belabored, because of the context of how this agreement arose. Okay. Can we talk about the Monell claim for just a minute? I guess I would like you to weigh in on what we were discussing here earlier with Mr. LaWinter. Is it your position that anything like the city charter grant here, which is a pretty broad grant for the city manager to create general employment rules, would make no decision by any type of department head, such as a police chief, fire chief, or other city official who makes an employment decision subject to Monell liability? I think it's clear that the charter wouldn't do so because, as the chief himself said, he was not unrestricted in his employment decisions. If he wanted to make a hiring or firing decision, he had to go through the human resources department, he had to go through counsel for the city. And as several cases discuss, just because a police chief or a fire chief has the authority to hire and fire, that doesn't make them the final policymaker for employment policy, and that's what the charter says. In fact, the union's collective bargaining agreement routes all grievances to the city manager because he's the final authority. I guess I'm just trying to figure out what's left of Monell then. When would there be Monell liability? If the city manager had been the one to fire her, I guess. I mean, I don't think the chief deciding to fire her with consultation from the entities I mentioned makes him the final policymaker for this limited hiring and firing. Who has review over what he does? The city manager and then the city council. Does it assert review? Do they assert review? Do they what? Do they assert review authority? In this case, I do not believe they asserted review authority. Let me ask you, for purposes of a Pickering analysis, one of the countervailing points that a city can make is that there's some really important governmental objective in the policy in question. Moonen, which my colleague sat on, made it very clear that the idea of maintaining employee morale and high public regard for the city and its officials is insufficient to buttress or countervail an unconstitutional prior restraint. So we can't use that here. What is the city's best argument that it has a countervailing public interest under Pickering to offset this very broad prior restraint in 5G? Well, the statements made by Plaintiff in the months leading up to her termination, where she, as I said, called a higher ranking officer a liar. That was interdepartmentally. Okay, so let's say that. Is that because is it morale within the police department you're concerned about? I think that's disruption of the hierarchy of the police department. It is something that she had also, I don't have it tagged, but she had also made comments about other employees that she said were questioning her professionalism. Again, these are all speech on personnel decisions and have nothing to do with speech on a matter of public concern. I mean, she never made any speech as a private citizen on a matter of public concern. So, yes, while the agreement could forestall such speech, it's all speculation because she never made any speech and she never complained about the general order to be. Does that make a difference in our prior restraint analysis that she didn't actually, if you will, violate the prior restraint? Technically, I don't think it does because so. It seems like that's the whole point of prior restraint. Yeah. Okay, any other questions by my colleague? If not, thank you, counsel. Thank you both. We appreciate your arguments. It's a very interesting case. It's now submitted and we will get you an answer as soon as we can. Thank you.
judges: M. Smith, Murguia, Hellerstein